## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID DOBBS, JEFFREY CORDISCO, LARRY DONNELY, VENUS LOUDER, JOSEPH LACHIOMA, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, AFL-CIO LOCAL 834 *Plaintiffs*, | ) ) ) ) ) ) ) | 3:25-CV-00824 (SVN) |
| | ) | February 4, 2026 |
| v. | ) ) | |
| BRIAN VAHEY, CHAIR OF THE STATE OF CONNECTICUT MUNICIPAL EMPLOYEES RETIREMENT COMMISSION ("CMERC"), in his official capacity; JEFFREY ARN, MICHELLE BOYLES, CARL CHISEM, MICHAEL FREDA, DAVID GLIDDEN, KURT MILLER, TROY RACCUIA, STEPHEN STEPHANOU, JEFFREY TOMCHIK, MEMBERS OF CMERC, in their official capacities, *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) | |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Sarala V. Nagala, United States District Judge.

Effective July 1, 2025, certain members of the Connecticut Municipal Employees' Retirement System who are otherwise eligible to retire can elect to defer their retirement allowance, while continuing their employment for up to five years, under a Deferred Retirement Option Plan ("DROP"). As relevant here, retirement-eligible firefighters may join the DROP at age 57 with five years of continuous service, at age 55 with 25 years of aggregate service, or with 30 years of aggregate service regardless of age. The Individual Plaintiffs, firefighters with the

Bridgeport Fire Department,[1] are eligible for retirement allowances by virtue of their tenure with the Fire Department, but are all under age 55, and therefore ineligible to join the DROP.  Plaintiffs claim that Defendants, trustees of the State of Connecticut Municipal Employees Retirement Commission ("CMERC"), violated Plaintiffs' Fourteenth Amendment rights to equal protection of the laws by enforcing this age-based classification, which they contend is arbitrary and irrational.

Defendants have moved to dismiss Plaintiffs' action, claiming (1) that this Court lacks jurisdiction to consider this action pursuant to the Eleventh Amendment and state sovereign immunity; (2) this Court should abstain from exercising jurisdiction under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); and (3) in the alternative, Plaintiffs fail to state a claim upon which relief may be granted because their claim is not legally cognizable and because the DROP eligibility requirements are rational.  *See* Def.'s Memo. of Law, ECF No. 45-1.  Plaintiffs in turn argue that the Court may exercise jurisdiction over their claims under the *Ex parte Young* doctrine; that *Burford* abstention is inappropriate here; and that the amended complaint successfully states a claim for age discrimination under the Equal Protection Clause.  *See* Opp. to Mot. to Dismiss, ECF No. 51.  Plaintiffs have also moved for a preliminary injunction, arguing they are suffering irreparable harm and are likely to succeed on the merits of their claims.  Pl.'s Mot. for Prelim. Injun., ECF Nos. 43–44.  Defendants oppose this motion.

For the reasons described below, the Court DENIES Defendants' motion to dismiss.  The Court cannot find, however, that Plaintiffs have met the standard for a preliminary injunction.  Thus, their motion for a preliminary injunction is DENIED.

---

[1] The Individual Plaintiffs' Union, International Association of Fire Fighters, AFL-CIO, Local 834, is also a plaintiff, representing similarly-situated firefighters (the "Union Plaintiff").

## MOTION TO DISMISS

### I.    FACTUAL BACKGROUND

#### A.  The DROP

The Connecticut Municipal Employees Retirement System ("CMERS") is a multi-employer retirement plan for employees of Connecticut municipalities.  *See generally* Conn. Gen. Stat. § 7-427.  In 2023, the Connecticut General Assembly passed a suite of reforms, including the DROP, to "restore solvency" to CMERS, which was facing financial struggles.  Legislative History, Ex. A to Mot. to Dismiss, ECF No. 45-2 at 14.  In the years before the legislative reforms, CMERS had rapidly become "catastrophic[ally]" expensive for participating municipalities.  *Id.* at 13.  The DROP proposal aimed to help lower the costs of the CMERS program by incentivizing skilled employees to "stick around and delay…retirement" for which they were otherwise eligible, *id.* at 23, thus increasing the average number of years an employee would work before beginning to receive retirement allowance benefits, *see* ECF No. 45-1 at 24.

Under the statute adopted by the Connecticut legislature, the Connecticut State Employees Retirement Commission "may create" a DROP, which "shall include a fixed period of time for member participation, not to exceed five years, and a specified rate of interest credit for member accounts." Conn. Gen. Stat. § 7-459b(b).  All other provisions of the DROP are to be determined by the Connecticut Municipal Employees Retirement Commission ("CMERC") created as a successor to the Connecticut State Employees Retirement Commission, "provided [that] the structure of such plan is certified by the consulting actuary . . . as having no anticipated impact on the contribution rates for municipalities participating in said fund."  *Id.*; Conn. Gen. Stat. § 7-448a(a).  The State Employees Retirement Commission created the DROP on April 18, 2024, by formally approving a set of DROP Regulations.  Am. Compl., ECF No. 30 ¶ 32.  As of January 2025, CMERC is responsible for the general administration and lawful operation of CMERS.  *See*

Conn. Gen. Stat. § 7-448a; ECF No. 30 ¶ 33.  The DROP took effect on July 1, 2025.  ECF No. 30 ¶ 1.

When a CMERS member elects to participate in the DROP, the member will continue to work and receive a salary from their employing municipality, rather than retiring and receiving a monthly retirement allowance.  *See* DROP Regulations, Ex. B to Mot. to Dismiss, ECF No. 45-2 at 38.  The member's monthly retirement allowance, calculated in accordance with statute as of the member's DROP effective date, is credited to a "DROP account" on the last day of each month.  *Id.* at 38–39.  The member's DROP account consists of these monthly allowance deposits, at least a portion of the member's CMERS contributions, and—once the member has participated in the DROP for two years—interest earnings.  *Id.* at 39–40.  Participants do not accrue any additional benefits toward their service retirement allowance as of their DROP effective date.  *Id.* at 39.  Each member may participate in the DROP for a period of time of their choosing, not to exceed five years.  *Id.* at 38.  Upon conclusion of the DROP participation period, the member terminates employment and exits the DROP.  *Id.* at 41.  The member may then receive distributions from their DROP account as a lump sum, a rollover of the account balance to another retirement plan, or some combination of the two.  *Id.*

Public safety employees of participating municipalities, including police officers and firefighters, are normally eligible for retirement upon (a) completing at least twenty-five years of aggregate service with a participating municipality; or (b) attaining age 55, provided the employee has five years of continuous service or fifteen years of aggregate service in a participating municipality.  *See* Conn. Gen. Stat. § 7-428.  Retirement-eligible municipal police and fire employees become eligible for the DROP:  (a) at age 57 with five years of continuous service; (b) at age 55 with 25 years of aggregate service; or (c) with 30 years of aggregate service, regardless

of age.  ECF No. 30 ¶ 39.  Thus, some public safety employees (including Plaintiffs) can be eligible

to retire—for instance, if they have completed twenty-five years of service—but ineligible to enter

the DROP, because they are not yet age 55 and have not completed thirty years of service.

      B.  <u>Relevant Procedural History</u>

      The Individual Plaintiffs are five individual firefighters ranging in age from 47 to 53.  *Id.*

¶¶ 9–18.  Each Individual Plaintiff is a member of CMERS who is eligible to retire and collect a

retirement allowance by virtue of serving the Bridgeport Fire Department full-time for twenty-five

years.  *Id.* ¶ 19.  But the Individual Plaintiffs are currently ineligible for participation in the DROP

because they are each under the age of 55 and have not worked for the Fire Department for long

enough to be eligible for the DROP regardless of age (30 years).  *See id.* ¶¶ 19, 39.  The Union

Plaintiff is the exclusive bargaining agent for the employees of the Bridgeport Fire Department,

including the Individual Plaintiffs and all other firefighters similarly situated (*i.e.*, having

completed 25 years of aggregate service but not yet having attained the age of 55,[2] and thus eligible

for retirement but ineligible for DROP).  *Id.* ¶ 21.  Plaintiffs sue ten trustees of CMERC in their

official capacities, alleging that the trustees are responsible for the administration and operation of

the state's municipal employee retirement system, including the DROP.  *Id.* ¶¶ 27–28, 33.

      Plaintiffs originally filed suit on May 23, 2025, and shortly thereafter sought a preliminary

injunction ordering Defendants to allow them to participate in the DROP when it took effect on

July 1, 2025.  *See* Compl., ECF No. 1; Mot. for Prelim. Inj., ECF No. 3.  The day before the

preliminary injunction hearing was to be held, Plaintiffs filed the amended complaint.  *See* ECF

---

[2] The Union Plaintiff avers that it brings suit on behalf of firefighters similarly situated to the Individual Plaintiffs (who are all under age 55 and eligible for retirement allowances).  *See* ECF No. 30 ¶¶ 21, 23.  It states that the firefighters on whose behalf it sues are eligible for retirement allowances, but does not clarify whether they are under the age of 55.  Given that all of the requested relief would be meaningless to firefighters over the age of 55 who would otherwise be eligible to enter the DROP, the Court will assume that the Union Plaintiff is not suing on such firefighters' behalf.

No. 30.  The amended complaint consists of four claims: violations of the Fourteenth Amendment right to equal protection of the laws as to the Individual and Union Plaintiffs, respectively, and age discrimination in violation of the Fourteenth Amendment as to the Individual and Union Plaintiffs, respectively.  ECF No. 30, ¶¶ 117–295.

As a result of the filing of the amended complaint, the Court mooted the earlier-filed motion for a preliminary injunction.  *See* Order, ECF No. 33.  Plaintiffs renewed their motion for a preliminary injunction on September 2, 2025.  *See* ECF No. 43.  Defendants, in turn, moved to dismiss the amended complaint, and oppose the request for a preliminary injunction.  *See* Mot. to Dismiss, ECF No. 45; Defs.' Inj. Opp. Br., ECF No. 50.  The Court held a preliminary injunction hearing and oral argument on the motions.

## II.    LEGAL STANDARD

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

A court generally may not consider matters outside of the complaint for purposes of a motion to dismiss without converting the motion into one seeking summary judgment.  *See* Fed. R. Civ. P. 12(d).  However, courts may consider extrinsic material "that the complaint incorporates

by reference, that is integral to the complaint, or of which courts can take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.,* 6 F.4th 293, 305 (2d Cir. 2021) (internal quotation marks omitted). A document is "integral" to the complaint when the plaintiff "relies heavily on its terms and effect" in drafting. *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002). Here, Plaintiffs relied on the text of the DROP regulations, the effects of the DROP, and the legislative history surrounding the authorization of DROP in drafting the complaint. *See* ECF No. 30 ¶¶ 39, 46. Courts may also take judicial notice of legislative history. *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022). Thus, the Court will consider the DROP regulations and legislative history submitted by Defendants in evaluating their motion to dismiss.

## III.    DISCUSSION

For the reasons discussed below, the Court rejects Defendants' arguments that the Court lacks subject matter jurisdiction over and should abstain from deciding this action, and further finds that Plaintiffs have adequately stated a claim under the Equal Protection Clause. Thus, it denies Defendants' motion to dismiss.

### A.    Sovereign Immunity

First, the Court concludes that the Eleventh Amendment to the U.S. Constitution does not bar this suit, as Defendants contend.

#### 1.    Legal Standard

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." As this Court has previously recognized, "[n]either the Second Circuit nor the Supreme Court has definitively determined whether the Eleventh Amendment is to be understood as a bar to subject matter jurisdiction or is 'more appropriately viewed as an affirmative defense.'" *Mallison v. Conn.*

*Office of Early Childhood*, 634 F. Supp. 3d 21, 30 n.2 (D. Conn. 2022) (quoting *Ripa v. Stony Brook Univ.*, 808 F. App'x 50, 50 n. 1 (2d Cir. 2020)); *see also Allco Fin. Ltd. v. Roisman*, No. 22-2726, 2023 WL 4571965, at *1 (2d Cir. July 18, 2023) (summary order). The Court believes that the opening phrase of the Eleventh Amendment, which provides that the "[j]udicial power of the United States shall not be construed to extend" to certain suits, suggests that the Amendment limits the subject matter jurisdiction of the Court, making Defendant's motion to dismiss for lack of subject matter jurisdiction proper. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (a case is properly dismissed for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it"). Plaintiffs have the burden of proving, by a preponderance of the evidence, that subject matter jurisdiction exists. *Cooke v. United States*, 918 F.3d 77, 80 (2d Cir. 2019).

The Eleventh Amendment generally bars private individuals from suing states—including arms of the state and state agents acting in their official capacities—unless one of a few specific exceptions to the rule of immunity applies. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985); *Tonina v. Conn. Dep't of Revenue Servs.*, 851 F. App'x 273, 274 (2d Cir. 2021) (summary order). There are three recognized exceptions to Eleventh Amendment immunity: (1) when a state consents to a lawsuit; (2) when Congress abrogates a state's Eleventh Amendment immunity; or (3) when the lawsuit seeks prospective injunctive relief against state officials—otherwise known as the *Ex parte Young* exception. *See CSX Trans., Inc. v. N.Y. St. Off. of Real Prop. Servs.*, 306 F.3d 87, 95, 98 (2d Cir. 2002); *see also Ex parte Young*, 209 U.S. 123 (1908). Here, the State has not waived Eleventh Amendment immunity and Plaintiffs do not contend the immunity has been abrogated by federal statute.

Thus, to avoid the operation of Eleventh Amendment immunity, Plaintiffs rely on the *Ex parte Young* doctrine, which provides that the Eleventh Amendment bar is lifted where "prospective injunctive relief" is sought in a suit against a state official to "'end a continuing violation of federal law.'" *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 73 (1996) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). Prospective relief designed to end violations of federal law is "necessary to vindicate the federal interest in assuring the supremacy of that law," whereas a remedy that serves only the interests of compensation or deterrence is "'insufficient to overcome the dictates of the Eleventh Amendment.'" *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (quoting *Green*, 474 U.S. at 68). Thus, suits against state officials in their official capacities for damages remain barred by the Eleventh Amendment, *see Will v. Mich Dep't of State Police*, 491 U.S. 58, 71 (1989); *Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005), as do suits seeking declaratory relief for past harms, *T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 92 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2700 (2025), but suits seeking prospective injunctive relief may proceed.

Not all suits seeking prospective injunctive relief are permissible, however. The Supreme Court has been careful not to extend the reach of *Ex parte Young* beyond a relatively narrow set of conditions. For example, "where Congress has created a remedial scheme for the enforcement of a particular federal right," a court should not "supplement that scheme" with its own remedy. *Seminole Tribe*, 517 U.S. at 74. Nor may a court grant an injunction sought on the basis of state law. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1983).

### 2. Discussion

Plaintiffs seek two forms of injunctive relief: (1) an injunction requiring Defendants to rescind and stop enforcing the age-based eligibility requirement to enter the DROP; and (2) a

second injunction requiring Defendants to permit Plaintiffs, and all Bridgeport firefighters eligible for a service retirement and under 55 years of age, to participate in DROP on the date of their eligibility for service retirement allowance. ECF No. 30 at 32–34. Plaintiffs also seek a declaratory judgment that Defendants' enforcement of the age-based eligibility requirement violates their rights to equal protection of the laws, and an award of costs and fees. *Id.*

The Court considers each requested form of relief in turn. It concludes that the first injunction Plaintiffs request, the declaratory relief, and the potential award of costs and fees are not barred by the Eleventh Amendment, but the second requested injunction is.

### a.    Injunctive Relief Requests

First, Plaintiffs' request for an injunction requiring Defendants to rescind and stop enforcing the age-based eligibility requirement is clearly a request for prospective relief that is not barred by the Eleventh Amendment. *See, e.g.*, *Holley v. Cook,* No. 3:20-CV-170 (MPS), 2020 WL 2494761, at *8 (D. Conn. May 14, 2020) (declining to dismiss a claim for injunctive relief that would "require defendants to alter or change" allegedly unconstitutional policies because it was prospective in nature). By stating that "[t]he dispute over participation in the DROP is, in essence, a dispute about how Plaintiffs' CMERS retirement benefits will be calculated *when they ultimately retire*," Defendants effectively concede that Plaintiffs do indeed seek prospective injunctive relief. *See* ECF No. 45-1 at 13 (emphasis in original). Thus, Plaintiffs' first request for injunctive relief is not barred by the Eleventh Amendment.

The Court cannot accept Defendants' argument that the Eleventh Amendment applies because they lack authority to implement the requested injunctive relief, on account of the statute's requirement that an actuary certify the DROP plan will have "no anticipated impact that would increase the contribution rates for municipalities." Conn. Gen. Stat. § 7-459b(b). To be sued under *Ex parte Young*, officials need not possess unilateral authority to enforce remedial changes to the

10

law; rather, *Ex parte Young* authorizes suits against state officials with "some connection with the enforcement" of the challenged policy. *Young*, 209 U.S. at 157–58 (recognizing that a state official may be "specially charged" with a duty to enforce a statute by operation of "general authority under some law," the particular act itself, or through the "general duties of the officer"). Here, it cannot be said that Plaintiffs have failed to allege *any* connection between Defendants and the challenged provision of law. Indeed, as the trustees of CMERC, Defendants are charged with administering the DROP. And even if actual certification is ultimately required, Defendants still have authority to structure the DROP. *See* Conn. Gen. Stat. § 7-459b(a). Thus, the requirement of an actuarial certification does not foreclose application of the *Ex parte Young* exception to Eleventh Amendment immunity. Although Defendants point to one district court opinion applying the Eleventh Amendment bar where the defendants at issue had no authority to implement the requested prospective injunctive relief—*Campbell v. City of Waterbury*, 585 F. Supp. 3d 194, 203 (D. Conn. 2022)—that case is distinguishable on its facts. There, the plaintiff sought return of a seized vehicle, but it was plain that neither of the state-official defendants (a state prosecutor and a deputy clerk) had the authority to return the car to the plaintiff. *Id.* at 198, 203. Here, by contrast, Defendants play a central role in structuring and administering the DROP. *See* Conn. Gen. Stat. § 7-459b(a).

Nor are Plaintiffs seeking to enjoin Defendants from violating *state* law. Defendants are correct that Eleventh Amendment immunity "prohibits federal courts from entering injunctions on the basis of state law," *Vega v. Semple*, 963 F.3d 259, 284 (2d Cir. 2020) (citing *Pennhurst,* 465 U.S. at 106), but Plaintiffs do not seek such an injunction. Plaintiffs certainly point out the incongruence between the age-55 DROP eligibility requirement and the terms of eligibility for retirement benefits under Connecticut General Statutes § 7-428, *see, e.g.*, ECF No. 30 ¶ 36, but

they do not bring any claim that their right to any retirement benefits conferred by state law is infringed. Rather, they allege violations of the federal Equal Protection Clause under § 1983, a federal statute. *See id.* ¶ 4. The particular relief they request—to bring DROP eligibility in line with eligibility for state retirement benefits, *id.* at 32–33—does not change that fact.

Finally, Defendants' selective citation to language in *Eberhard v. Marcu*, 530 F.3d 122, 134 (2d Cir. 2008) suggesting that federal law does not give a district court "the authority to re-write or ignore state law" is inapposite. ECF No. 45-1 at 3, 16. *Eberhard* did not involve Eleventh Amendment immunity or a request for injunctive relief, and thus the language Defendants point to within it has no bearing on the question that this Court must decide.

For these reasons, Plaintiffs' first request for an injunction ordering Defendants to rescind and stop enforcing the age-based eligibility requirement not is not barred by the Eleventh Amendment.

On the other hand, Plaintiffs' second request for injunctive relief is barred. This Court cannot order Defendants to allow all Plaintiffs to participate in the DROP "on their satisfying their eligibility for service retirement allowances." *See* ECF No. 30 at 33–34. As noted, the amended complaint was filed before the effective date of the DROP (July 1, 2025). The benefit of participation in the DROP is financial; if a firefighter does not participate in the DROP, they are ineligible to receive their retirement allowance credited into their DROP account, for payment as a lump sum or annuity at a later date.[3] The requested injunctive relief as to any of the individual plaintiffs and any similarly situated firefighters who were eligible for retirement allowances as of the date of the amended complaint—or any date before the date of this Order—is barred as

---

[3] Note that members may participate in the DROP for only five years; should any plaintiff or similarly situated firefighter join the DROP when they turn 55 and participate in the program for the full five years, they will receive a credit that reflects the allowable interest that would have accrued over that time. ECF No. 45-1 at 39–40.

retrospective. *See Edelman v. Jordan*, 415 U.S. 651, 668–69 (1974) (barring relief "measured in terms of a monetary loss resulting from a past breach of a legal duty"); *Ward*, 207 F.3d at 122. This is so because, at this point, to admit any such plaintiff to the DROP as of the date of his or her eligibility for retirement allowances may result in monetary credits from the state treasury to the member's DROP account to make the member whole for past losses. As Defendants argue, this is precisely the kind of relief that is barred by the Eleventh Amendment. *See Ward*, 207 F.3d at 122 ("[Plaintiffs are] seeking relief that in every practical sense amounts to an order requiring Connecticut to pay them money on account of entitlement to past benefits."). It is not a merely "ancillary" expenditure incurred as the "inevitable consequence" of compliance with a prospective injunction. *Cf. Edelman*, 415 U.S. at 667–68. To the extent that rescission and nonenforcement of the age-based eligibility requirement *going forward* would require the state to spend money, such an effect would be merely "ancillary." But to the extent Plaintiffs request admittance to the DROP as of retirement dates that have already passed, such relief is properly considered retrospective and is barred by the Eleventh Amendment.[4]

### b.  Declaratory Relief Request

Next, the Court concludes that Plaintiffs' request for declaratory relief is at least in part prospective, and thus not barred by the Eleventh Amendment. In requesting that this Court "declare the conduct engaged [in] by the [D]efendants. . . to be in violation of" Plaintiffs' rights, ECF No. 30 at 32–33, Plaintiffs seek a declaration of past, as well as allegedly ongoing, violations of the law. Insofar as this is a request for prospective relief, it certainly is not barred, and the Eleventh Amendment does not bar a retrospective declaration that a state official violated federal law when it is "no broader than necessary to complement the injunction against the current

---

[4] To the extent that the Union Plaintiff seeks admittance to the DROP on the date of eligibility for retirement allowance on behalf of firefighters who are not yet eligible, such relief would not be barred as retrospective.

violation of federal law." *Green*, 474 U.S. 64 at 69.  Plaintiffs' requested declaration is coextensive with their request for an injunction barring Defendants from violating their rights in the future.

The Court is not convinced that—as Defendants argue—declaratory relief is inappropriate because Plaintiffs framed their request in the past tense.  First, the word "engaged" is not necessarily a past-tense verb in this context, and Plaintiffs filed their original complaint several days before the DROP and its age requirements took effect.  Second, and more saliently, a request for declaratory relief that focuses on past conduct is not always barred.  Where, as here, there is no indication that the retrospective relief sought would "impose *upon the State* 'a monetary loss resulting from a past breach of a legal duty,'" declaratory relief functionally adds nothing to the state's financial exposure and is not barred by the Eleventh Amendment.  *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 646 (2002) (quoting *Edelman*, 415 U.S. at 668); *cf. T.W.*, 110 F.4th at 92 (2d Cir. 2024) (denying plaintiff's request for declaratory relief that "d[id] not overlap" with her request for injunctive relief).

c.  Costs and Fees

Finally, Plaintiffs request an award of costs and fees.  Defendants do not make any arguments specific to this requested relief.  But in any event, such relief, were it warranted, would not be barred by the Eleventh Amendment.  *Hutto v. Finney*, 437 U.S. 678, 679 (1978) ("Costs have traditionally been awarded against States without regard for the States' Eleventh Amendment immunity, and it is much too late to single out attorney's fees as the one kind of litigation cost whose recovery may not be authorized by Congress without an express statutory waiver of States' immunity"); *Dwyer v. Regan*, 777 F.2d 825, 837 (2d Cir. 1985).

B.  Abstention

Next, the Court concludes that it need not abstain from this action under the *Burford* abstention doctrine.

*Burford* dictates that, under certain circumstances, federal courts should abstain from exercising jurisdiction in cases involving "specialized, ongoing state regulatory schemes," *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir. 1980), if (1) a case "presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar,'" or if (2) federal adjudication "'would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726–27 (1996) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)).  Defendants posit that this Court should abstain from this matter, pursuant to *Burford*, on the grounds that the DROP is part of one such specialized, ongoing state regulatory scheme.  The Court does not find such abstention warranted here.

To start, *Burford* allows a federal court to dismiss a case "only in extraordinary circumstances." *Quackenbush*, 517 U.S. at 726.  *Burford* and its progeny analyze the propriety of abstention in light of the specific facts of each case, balancing "the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem." *Id.* at 728 (quotation marks omitted); *Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1245 (2d Cir. 1992) ("Every abstention case is to be decided upon its particular facts").  For example, courts might consider whether a question requires significant familiarity with local regulations or whether the state has established a "unified" regulatory program.  *New Orleans Pub. Serv., Inc.*, 491 U.S. at 361, 364 (citing *Alabama Pub. Serv. Comm'n v. Southern R. Co.*, 341 U.S. 341, 349 (1951)); *see also Levy*, 635 F.2d at 964 (finding abstention appropriate where federal review carried "the potential for creating inequities in the administration of the state scheme").  The Second Circuit has generally looked to three factors in determining whether *Burford* abstention is appropriate:

whether there exists a highly specific state regulatory scheme, whether the suit implicates the discretionary interpretation of state statutes, and whether the subject matter of the litigation is traditionally one of state concern. *See Bethphage,* 965 F.2d at 1243.   Importantly, however, "*Burford* does not require abstention whenever there exists a complex state administrative process, or even in all cases where there is a potential for conflict with state regulatory law or policy from federal litigation, but only where there would be 'undue' federal interference." *Id.* at 1247 (*citing New Orleans Pub. Serv., Inc.*, 491 U.S. at 362).

In keeping with this principle, the Second Circuit has closely analyzed whether federal interference would be "undue," and typically has found the exercise of jurisdiction appropriate where the plaintiff is pursuing federal constitutional claims. *See Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 117 (2d Cir. 1998) (*Burford* abstention was inappropriate where plaintiffs raised "only federal claims in a challenge to the constitutionality of [a] statute and its implementing regulations," and did not collaterally attack a final determination by a state agency, or seek to influence a state administrative proceeding); *Williams v. Lambert*, 46 F.3d 1275, 1283 (2d Cir. 1995) ("*Burford* abstention is not applicable because the district court was not asked to adjudicate any facts or to fashion public policy"); *but see Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 648–51 (2d Cir. 2009) (finding *Burford* abstention appropriate in action by insurance company where the challenged workers' compensation law was a "matter of traditional and substantial state concern" and provided a "very specific" prescription for "the methods and means" for compensating injured workers, and where federal court intervention might create confusion in state trustees' administration of a state-run trust fund).

Dismissal under *Burford* is not appropriate here.  Examining the *Bethphage* factors, it is true that Connecticut's municipal employee pension system is specific, but the first *Bethphage*

factor focuses "on the extent to which the federal claim requires the federal court to *meddle* in a complex state scheme." *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998) (emphasis in original).  Resolution of the federal constitutional claims Plaintiffs are pursuing here does not require meddling in the state retirement system's regulatory scheme; rather, it will require adjudication of whether the scheme, as applied to Plaintiffs, violates Plaintiffs' equal protection rights under the U.S. Constitution.   *See Cranley v. Nat'l Life Ins. Co.*, 144 F. Supp. 2d 291, 299 (D. Vt. 2001) (finding that first factor weighed against dismissal because the plaintiffs sought determinations of whether the statutory scheme at issue and the state official's actions violate the federal constitution).  Nor does the Court does perceive any risk that exercising jurisdiction here will "create a potential for piecemeal review" of state claims.  *See Levy*, 635 F.3d at 964.  Plaintiffs sue the administrators of the entire state program.  *See* ECF No. 30 ¶ 1; *Dittmer*, 146 F.3d at 117 (finding abstention inappropriate where plaintiffs brought a "systemic challenge" rather than attacking an "individual determination").  Furthermore, there is no suggestion that rescission of the age-55 eligibility requirement, if Plaintiffs ultimately are successful in the suit, would create cascading and confusing administrative effects.  *Cf. Liberty Mut*, 585 F.3d at 651.  Rather, any decision by this court on the constitutionality of the age-based eligibility requirement would apply uniformly to the DROP statewide and would not result in any incoherence in the administration of the DROP.

Second, this case does not involve construction of a state statute, weighing against dismissal.  Plaintiffs seek a determination that their ineligibility for the DROP is unconstitutional; such a determination does not "put the federal court in the business of interpreting the state regulatory regime." *Hachamovitch*, 159 F.3d at 698.  For instance, the federal court would not be

"second-guessing" [a] state agency's interpretation of state law." *See Cranley*, 144 F. Supp. 2d at 300.

Finally, even though the administration of a state pension system is traditionally one of state concern, this factor alone cannot justify dismissal on *Burford* grounds. *Burford* abstention is not required "even in cases where the state has a substantial interest if the state's regulations violate the federal constitution." *Hatchamovitch*, 159 F.3d at 698; *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 601 (2d Cir. 1988) ("The state has no right to an unconstitutional policy, coherent or otherwise.") (internal quotation marks omitted); *see also Cranley*, 144 F. Supp. 2d at 300. Thus, the Court cannot find that exercising jurisdiction would create "undue" interference with state policy.

Contrary to Defendants' view, *Pineman v. Oechslin*, 637 F.2d 601 (2d Cir. 1981) ("*Pineman I*"), does not govern this case. ECF No. 45 at 16–17. In *Pineman I*, the Second Circuit abstained from resolving whether a Connecticut retirement plan violated certain employees' rights on Contract Clause grounds, reasoning that it should first "afford the state courts an opportunity to adjudicate" the predicate question of whether Connecticut state employees had vested pension rights prior to becoming eligible to receive benefits (in other words, whether a contract existed under state law). *Pineman I*, 637 F.2d at 605. The Second Circuit found that abstention was appropriate under *Railroad Commission v. Pullman*, 312 U.S. 496 (1941), because "the state common law rule. . . [was] highly uncertain," and under *Burford* because "[t]he subject matter, the fixing of compensation benefits to state employees, is of vital importance to the State and its governmental functioning." *Id.* at 605–06 (citing *Burford*, 319 U.S. at 332). Despite dismissing the case on these two abstention grounds, however, the Second Circuit noted that federal courts should resolve the constitutional law question *after* the state provided an answer to the contract

law question. *Pineman I*, 637 F.2d at 605 ("[T]he federal courts, thereafter resolving the constitutional issue, will not be obliged to give the state court ruling the conclusive deference that abstention normally entails"). And after the Supreme Court of Connecticut held that no contract existed under state law, the federal courts did indeed rule on both the contract law question and the constitutional question at issue. *Pineman v. Fallon,* 662 F. Supp. 1311, 1315 (D. Conn. 1987) ("*Pineman II*"), *aff'd*, 842 F.2d 598, 600 (2d Cir. 1988) (affording "appropriate deference" to the state court's determination of the contract law question, while also holding that no contract existed and thus no constitutional violation occurred).

The constitutional issue in this case—whether the terms of the DROP violate Plaintiffs' rights under the Equal Protection Clause—involves similar subject matter to the dispute in *Pineman.* But despite the Second Circuit's reference to *Burford* abstention in *Pineman I*, the court's acknowledgment that the constitutional issue was appropriate for resolution by the federal courts makes clear that the unresolved state law question, not the subject matter, was the determining factor in the decision to abstain. *See Pineman I*, 637 F.2d at 605; *Pineman II*, 842 F.2d at 600–01. And the Second Circuit did not abstain from deciding the federal constitutional questions when the case was reactivated in federal court as *Pineman II. Pineman II*, 842 F.2d at 600–03. Thus, the *Pineman* cases do not support abstention here.

The Court therefore declines to abstain from adjudicating this dispute under *Burford*.

C. <u>Age Discrimination</u>

Finally, the Court concludes that Plaintiffs have stated cognizable claims for relief.

    *1.  Age Discrimination under § 1983*

Under 42 U.S.C. § 1983, a plaintiff may sue state officials in their official capacities to remedy violations of federal law.[5]  The Equal Protection Clause of the Fourteenth Amendment requires that no state "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  While courts are divided on whether a plaintiff may bring an equal protection claim of age discrimination pursuant to § 1983, this Court—and courts in this Circuit— tend to permit them.  *See Reed v. Town of Branford*, 949 F. Supp. 87, 89 (D. Conn. 1996); *Goodmaster v. Town of Seymour*, No. 3:14-CV-00060 (AVC), 2015 WL 1401966, at *6 (D. Conn. Mar. 26, 2015); *Volpi v. Ctr. Moriches Union Free Sch. Dist.*, 9 F. Supp. 3d 255, 257 (E.D.N.Y. 2014); *Purdy v. Town of Greenburgh,* 166 F. Supp. 2d 850, 868 (S.D.N.Y. 2001) (holding the Age Discrimination in Employment Act ("ADEA") does not preempt a § 1983 action for age discrimination when the § 1983 claim is based on substantive rights distinct from those established by the ADEA, such as the right to equal protection of the laws).  To be sure, a majority of the Courts of Appeal have held that the ADEA preempts claims of age discrimination in employment under § 1983.  *See, e.g., Hildebrand v. Allegheny County*, 757 F.3d 99, 108–10 (3d Cir. 2014) (holding that the ADEA is "the exclusive remedy" for "age discrimination in employment"); *Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1369 (4th Cir. 1989) (holding that "the provisions of the ADEA . . . evidence congressional intent to foreclose actions for age discrimination under § 1983").  The Second Circuit, however, has not joined them.  *See Butts v.*

---

[5] Plaintiffs argue that there is no need to prove "personal involvement" of the Commissioners in order to sue under § 1983.  *See* ECF No. 51 at 14–15.  Defendants did not raise any arguments about their personal involvement.  Thus, this argument is superfluous and need not be considered.

*NYC Dep't of Hous. Pres. & Dev.*, 307 F. App'x 596, 598 n.1 (2d Cir. 2009) ("We are aware of no opinion of this Court addressing whether the ADEA preempts age discrimination claims based on a violation of the Equal Protection Clause and brought under § 1983."); *Piccone v. Town of Webster*, 511 F. App'x 63, 63 n.1 (2d Cir. 2013) ("It is an open question in our circuit whether the ADEA preempts age discrimination claims under Section 1983.")).  The Court finds no reason to depart in this case from the weight of authority established by the district courts in this Circuit. [6]

The Second Circuit has likewise not determined whether "reverse age discrimination," *i.e.*, discrimination against younger individuals, is a cognizable claim under the Equal Protection Clause, though this Court has considered actions claiming such discrimination on the merits.  *See, e.g.*, *Presnick v. Berger*, 837 F. Supp. 475, 477–78 (D. Conn. 1993) (Cabranes, D.J.) (rejecting the "reverse age discrimination" claim).  It is clear, however, that the ADEA does not offer protection against reverse age discrimination.  *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593–94 (2004).  Defendants argue that because the ADEA "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional" under the Equal Protection Clause, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 86 (2000), a plaintiff necessarily cannot bring a claim under the Equal Protection Clause relating to age discrimination against the relatively young.  ECF No. 45-1 at 19.  On this front, Defendants' logic is flawed, and overlooks the possibility—preserved in this Circuit—that the ADEA is designed to address a particular type of age discrimination rather than altogether supplant the Equal Protection Clause's prohibition on

---

[6] The Court further notes that Plaintiffs do not bring this action against the Bridgeport Fire Department (their employer), but against the members of CMERC.  The Second Circuit has long recognized that the ADEA governs only *employer-employee* relationships.  *See, e.g.*, *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 509 (2d Cir. 1994) ("The ADEA prohibits *employers* from discriminating on the basis of age against their *employees*.") (emphasis in original).  Defendants emphasize this fact in support of their argument that the ADEA should bar Plaintiffs' claims, ECF No. 45-1 at 20, but it cuts in the opposite direction here.  In light of the weight of authority in this Circuit, it would be odd, at the very least, for this Court to find Plaintiffs' claims preempted by a statute that would not otherwise govern their relationship with Defendants.

irrational age-based classifications.  Defendants have pointed to no authority supporting the principle that the ADEA's lack of protection for reverse age discrimination should be extended to the equal protection context.  *Kimel*'s statement comparing the scope of ADEA and the Equal Protection Clause does not go so far.  In the absence of any controlling (or even persuasive) authority on this issue, the Court holds that Plaintiffs may assert a cognizable claim for reverse age discrimination.

### 2.  *Adverse Treatment*

To maintain an equal protection claim, a plaintiff must first show adverse treatment compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations—here, Plaintiffs' age.  *See Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 288 (S.D.N.Y. 2019) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005). *Res. Servs., LLC v. City of Bridgeport*, 590 F. Supp. 2d 347, 353 (D. Conn. 2008) (citing *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008)).  Although Defendants do not argue that Plaintiffs have failed to allege adverse treatment in so many words, they do claim that because age is not the "sole criterion of eligibility" for the DROP, Plaintiffs have failed to establish they "are being denied a benefit that is consistently available to older similarly situated employees."  ECF No. 45-1 at 28.  Thus, the Court examines whether Plaintiffs have adequately alleged adverse treatment, and concludes that they have.

The injury in an equal protection case is the "denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain the benefit."  *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666 (1993).  Here, Plaintiffs allege that the eligibility criteria for the DROP—that they must be age 55, even if they have completed the requisite service requirement for a retirement benefit allowance—is such a

barrier that their colleagues aged 55 and older do not have to face.  Defendants argue that Plaintiffs'

true dispute is with the DROP's service requirements, not its age requirements, because eligibility

for the DROP can be based on age, length of municipal service, or a combination of the two.  *See*

ECF No. 45-1 at 27–28.  But Plaintiffs' challenge to the age-based classification is not impugned

by the existence of additional, separate qualifying criteria.  And, for employees like Plaintiffs who

have completed more than 25 but less than 30 years of service, the DROP clearly treats employees

over 55 differently from those under 55.  The older employees are granted DROP eligibility, and

the younger employees are denied eligibility.   Thus, Plaintiffs have adequately alleged disparate

treatment on the basis of their age.

> *3.  Rational Basis*

Finally, the Court holds that Plaintiffs have plausibly alleged that the age classification

does not have a rational basis.

"[A]ge is not a suspect classification under the Equal Protection Clause."  *Kimel*, 528 U.S.

at 83.  If a law "'neither burdens a fundamental right nor targets a suspect class," a court must

"uphold the legislative classification so long as it bears a rational relation to some legitimate end.'"

*United States v. Skrmetti*, 605 U.S. 495, 510 (2025) (quoting *Romer v. Evans*, 517 U.S. 620, 631

(1996)).  A non-suspect classification "'must be upheld against equal protection challenge if there

is any reasonably conceivable state of facts that could provide a rational basis for the

classification.'"  *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 219 (2d Cir. 2012) (quoting

*FCC v. Beach Commc'ns, Inc*., 508 U.S. 307, 313 (1993)).  This is a highly deferential standard

of review reflecting a "strong presumption of validity," and Plaintiffs bear the burden of negating

"every conceivable basis which might support" the challenged provision.  *Progressive Credit*

*Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (quoting *Beach Commc'ns*, 508 U.S. at

314-15)).  To withstand a motion to dismiss, Plaintiffs must "plead sufficient facts that, treated as true, to overcome the presumption of rationality that applies to government classifications." *Progressive Credit Union*, 889 F.3d at 49–50.

First, the Court notes that Defendants' argument about the rationality of the age classification—that it incentivizes skilled employees to delay their retirement beyond the date they are first eligible to collect pension benefits, thereby extending the period during which the employees contribute to the plan and delaying the time at which they begin to receive payments— are not in fact arguments about the rationality of the challenged age classification at all:  they are simply arguments about the rationality of adopting a DROP as a whole.  *See* ECF No. 45-1 at 23 ("[The DROP] is also intended to encourage . . . skilled employees to stick around and delay their retirement").  Defendants do not meaningfully explain why this reasoning would apply differently to retirement-eligible firefighters who are under age 55 than to those who are age 55 or older.  The desire to keep skilled employees working for a longer period and to delay paying benefits applies to all employees, regardless of age, and therefore does not squarely address the age-55 requirement Plaintiffs challenge here.

The natural rational basis that could be offered for the age-55 eligibility criteria is cost.  It is possible that, if the eligibility criteria were relaxed and younger people, including Plaintiffs, were allowed to join, the projected savings to CMERS from implementing the DROP might decrease, when compared to the projected savings that could be achieved if tighter eligibility requirements were in place.  But Plaintiffs allege that "[t]he State of Connecticut will not receive any benefit, nor any cost savings, by excluding police officer and firefighter members of CMERS, who have satisfied the eligibility requirements for receiving a service retirement allowance, from participating in the DROP."  ECF No. 30 ¶ 44.  Although this allegation is somewhat conclusory,

Plaintiffs have also argued that CMERS will incur the cost of paying their retirement allowances for the remainder of their lives regardless of whether or not they are allowed to join the DROP (given that they are presently eligible for retirement) and that their salaries will be paid by their municipalities while participating in the DROP, resulting in no additional cost to CMERS. ECF No. 51 at 31. Plaintiffs have satisfied their burden at this stage by alleging that the DROP's eligibility requirements create no clearly identifiable cost savings.

And Defendants' submissions in support of their motion to dismiss do not offer that clarity. For their part, Defendants have not articulated in their motion to dismiss briefing a cost-based rationale for excluding these public safety employees with twenty-five years of service from being able to enter the DROP until they turn 55 years old, aside from the general acknowledgment that CMERS may only offer the DROP if it would not increase the contribution rates for municipalities. *See* Conn. Gen. Stat. § 7-459b(b). But Defendants do not connect the dots between Plaintiffs' requested relief and the statutory requirement: they do not argue that allowing Plaintiffs to enter the DROP would increase the contribution rates for municipalities, such that the DROP would become impermissible under the statute. *See* ECF No. 45-1 at 24. Although the Court is permitted to hypothesize a rational basis for a classification, *see Progressive Credit Union*, 889 F.3d at 50, it would be inappropriate to do so without *any* such cost-based argument being made by Defendants in opposition to the motion to dismiss, when Plaintiffs have alleged that no benefit or cost savings will result from their inclusion in the DROP. Of course, Defendants are free to renew their argument that there is a rational basis for the age classification at summary judgment, depending on the evidence developed in discovery.

Thus, although this is a close question, the Court concludes that Plaintiffs have adequately alleged violations of the Equal Protection Clause based on the DROP's age-based eligibility criteria.  Defendants' motion to dismiss is therefore DENIED.

* * *

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Having concluded that Plaintiffs state plausible equal protection claims, the Court proceeds to deciding whether they are entitled to preliminary injunctive relief.  It concludes they are not, and denies their motion for a preliminary injunction.

### I.    ADDITIONAL RELEVANT FACTS

The following additional facts are drawn from the parties' briefing and the testimony provided at the preliminary injunction hearing.

#### A.  The CMERS Reforms

Defendants submitted an affidavit from Connecticut State Comptroller, Sean Scanlon, describing the genesis of the DROP.  In reaction to CMERS' "serious financial challenges," Scanlon convened a "working group" to discuss possible changes to the state retirement plan.  Scanlon Aff., ECF No. 50-1 ¶¶ 12–13.  The group aimed to reduce costs for municipalities participating in CMERS, reasoning that "a cost reduction could . . . induce [additional] municipalities to join the plan," and that a "larger [CMERS] membership could, by itself, contribute to lower costs."  *Id.*  ¶ 14.

In 2001, when CMERS was financially secure, the Connecticut General Assembly amended the CMERS plan by statute to make it more generous for members, guaranteeing a 2.5% annual minimum cost of living adjustment ("COLA"), regardless of the actual rate of inflation, payable each July following a member's retirement.  *Id.* ¶¶ 10–11.   By 2023, municipal contributions to CMERS had exploded to 25% of payroll—up from 3% in 2001—and CMERS' liabilities far outstripped its assets.  *Id.* ¶¶ 10–12.  State officials believed the guaranteed minimum COLA was one of the primary sources of CMERS' financial troubles.  *See id.* ¶ 15.  Comptroller Scanlon's working group quickly determined that replacing the guaranteed minimum COLA with one that tracked national inflation rates, and requiring that CMERS members be retired for at least

one year before their first COLA, would reduce costs. *Id.*; Ex. B to Scanlon Aff., ECF No. 50-1 at 17.

Another major reform the working group considered was whether to implement a DROP, a program that incentivizes delayed retirement and which had first been approved by the state legislature in 2000. Scanlon Aff. ¶¶ 18–19; ECF No. 50-1 at 17. Scanlon noted that, although DROPs are popular employee benefits, they are not usually effective in reducing costs, so the CMERS working group engaged Cavanaugh MacDonald Actuarial Consulting Services ("CavMac") to estimate the potential cost or savings of implementing a CMERS DROP. *Id.* ¶¶ 19–20. CavMac informed the working group that limiting DROP eligibility through age and service requirements would ensure it would help reduce costs. *Id.* ¶ 20. Defendants have submitted an affidavit from an actuary from CavMac, Ed Kobel. *See* ECF No. 50-2.

The working group proposed differential eligibility requirements for police officers and firefighters ("public safety employees") as compared to all other municipal workers, reasoning that public safety employees often began their careers earlier and retired earlier. Ex. D to Scanlon Aff., ECF No. 50-1 at 56. The first estimate envisioned a DROP available to public safety employees meeting certain age and eligibility criteria that exceeded their criteria for normal retirement eligibility: they could enter at age 55, with 25 or more years of service.[7] Scanlon Aff. ¶ 21. This DROP proposal, along with the elimination of the guaranteed 2.5% minimum COLA, would "produce savings of more than $840 million over a period of 30 years." *Id.*; Koebel Aff., ECF No. 50-2 ¶ 8.

---

[7] In their affidavits, both Comptroller Scanlon and Mr. Koebel report that the initial proposal for which CavMac produced a savings estimate considered eligibility criteria at age 55 with 25 years of service, age 60 with 30 years of service, or age 62 with 5 years of service. *See* ECF No. 50-1 ¶ 21; ECF No. 50-2 ¶ 8. These statements conflict with Comptroller Scanlon's email to the working group dated May 21, 2023, Ex. C, ECF No. 50-1 at 20, in which he stated that "the initial proposal," which created projected savings of $843 million, would allow employees to enter the DROP after "35 years of service" at any age; the affidavits do not detail an initial proposal under which employees could enter the DROP at any age, after a specific term of service.

After consultation with stakeholders, the working group asked CavMac to produce a second savings estimate with age and eligibility requirements matching the eligibility criteria for a normal retirement (25 years of service at any age, or age 55 with either 15 years of aggregate service or 5 years of continuous service). Scanlon Aff. ¶ 23; Koebel Aff. ¶ 9. It is not clear whether the second proposal retained the elimination of the guaranteed minimum COLA. CavMac estimated that this would reduce the savings of the overall package by more than $180 million over 30 years. Scanlon Aff. ¶ 23; Koebel Aff. ¶ 9. That is, while the initial proposal would save $840 million, the revised proposal would save only $660 million.

The working group then decided to split the difference. It modified its proposal to make the DROP available to public safety employees with 30 years of service at any age. Scanlon Aff. ¶ 24; Koebel Aff. ¶ 10. (It is not clear whether the third analysis, like the first two, involved alternative age-based DROP eligibility requirements.) The third proposal also phased out the guaranteed minimum COLA, rather than eliminating it immediately. Scanlon Aff. ¶ 25; Koebel Aff. ¶ 10. CavMac estimated that this plan would reduce savings by only $100 million when compared with the initial proposal. Scanlon Aff. ¶ 26; Koebel Aff. ¶ 10. In other words, it would produce over $80 million more in savings than the second proposal, for a total savings of $740 million. *See id.* It was therefore more attractive than the second proposal, but less attractive than the initial proposal, with respect to the savings it could offer CMERS over time. In short, it was a potentially workable compromise.

Thus, Comptroller Scanlon recommended that the working group adopt the reforms reflected in CavMac's third estimate—including DROP eligibility for public safety employees at age 55 with 25 years of service, age 62 with 5 years of service, or 30 years of service at any age. Scanlon Aff. ¶ 27; Ex. D to Scanlon Aff., ECF No. 50-1 at 20–21. The 2.5% minimum guaranteed

COLA would also be phased out over a period of five years, such that a member who retired in July 2025 would receive a minimum 2% COLA, a July 2026 retirement would result in a minimum 1.5% COLA, and so forth.  ECF No. 50-1 at 21.  A member retiring after July 2029 will receive a COLA that tracks inflation rather than a guaranteed minimum.  Ex. C. to Piwonski Aff., ECF No. 50-3 at 10–11.  These terms, according to Comptroller Scanlon, took account of the fact that public safety employees often begin their careers early; offering the DROP to employees with 30 years of service regardless of age would allow those employees to benefit from the DROP without having to "extend their careers to an unusual degree."  Scanlon Aff. ¶ 24.  In an email to the working group, Scanlon conveyed that he was "confident these changes have dramatically improved the way our police and fire members feel about the overall plan while still creating three quarters of a billion dollars' worth of savings." *Id.* ¶ 27; ECF No. 50-1 at 20.

After the working group accepted the Comptroller's recommendation and made their proposals public, the group held meetings with state legislators to draft and explain the necessary legislation.  Scanlon Aff. ¶ 29.  Around the same time, they also met with stakeholders, including the Union Plaintiff, to discuss the proposed reforms.  ECF No. 50-1 at 13–14.  The working group's proposed legislation, including the DROP's eligibility requirements, was adopted as Public Act No. 23-182, as an amendment to the preexisting legislative authorization for a DROP.  *See* Conn. Gen. Stat. Sec. 7-459b; ECF No. 50-1 ¶¶ 31–32.  After the bill's passage and after the State Employees Retirement Commission adopted the DROP regulations, CMERS held meetings with employee members, including the Individual Plaintiffs, to explain their new benefits under the CMERS reforms.  Scanlon Aff. ¶ 37; Piwonski Aff. ¶¶ 15–16 .  The Individual Plaintiffs received counseling about the new benefits between April 30, 2024, and May 7, 2024.  Piwonski Aff., ¶ 16.

B. <u>Preliminary Injunction Hearing</u>

In advance of the preliminary injunction hearing and in response to Defendants' written submissions, Plaintiffs argued that the $80 million savings figure cited in Scanlon's affidavit was "fatally flawed" because it improperly included "members who are fifty-five years of age or older with either five years of continuous service or fifteen years of aggregate service." Pls.' Reply Br., ECF No. 52 at 4. Put another way, Plaintiffs claimed that Defendants' financial projections did not isolate the financial effect of allowing public safety employees to enter the DROP *only* when they had twenty-five years of service, without also considering public safety employees who were age 55 with five years of continuous service or fifteen years of aggregate service to enter (the other criteria for normal retirement for public safety employees). *Id.* Plaintiffs argued that, therefore, Defendants had not demonstrated a rational basis for excluding them from the DROP, because Defendants' calculations were overbroad.

During the preliminary injunction evidentiary hearing, Comptroller Scanlon testified on direct examination by Plaintiffs' counsel that CavMac did not isolate the impact of allowing entry into the DROP with twenty-five years of service at any age. *See* Tr., ECF No. 73 at 30. Then, during Defendants' cross-examination, counsel produced, for the first time, a document (marked as "Exhibit L") purporting to show that Defendants compared the savings associated with a DROP available to members with 25 years of experience at any age to the savings associated with a DROP available to members with 30 years of experience at any age. *See* Tr., ECF No. 73 at 39–42. Exhibit L calculates "Saving with P&F [police and fire] DROP @ 25 years" to be $230,189,000 for police and fire without social security and "Saving with P&F DROP @ 30 years" to be $298,618,000 for the same category of individuals.[8] After being shown Exhibit L, Comptroller

---

[8] Exhibit L also calculates these two categories of savings for "Police and Fire with Social Security."

Scanlon testified that CavMac had, in fact, conducted a calculation that isolated the impact of DROP eligibility for public safety employees at 25 years of service regardless of age.  *See* ECF No. 73 at 43–44, 51.[9]  The admissibility of Exhibit L is discussed below.

After the evidentiary hearing, Defendants' counsel represented to the Court that both Mr. Koebel's and Mr. Scanlon's affidavits contained inaccuracies regarding the calculations CavMac actually performed.  *See* Notice, ECF No. 69.  In particular, counsel clarified that the calculation CavMac performed "compared 1) the projected savings of all of the changes to CMERS that were ultimately adopted in 2023, including the DROP being offered to public safety employees who complete 30 years of service, with 2) the same set of changes, but with a DROP that is available to public safety employees who complete 25 years of service at any age," and did not "consider a DROP that would be available to public safety employees who reached age 55 with 5 years of continuous service or 15 years of aggregate service."  *Id.* at 2.  In other words, it appears Defendants now claim CavMac conducted the precise calculation Plaintiffs contend was previously missing from the record.  Defense counsel then filed a supplemental affidavit from Ed Koebel purporting to correct that inaccuracy.  *See* Notice, ECF No. 72.  As both parties acknowledge, it would be inappropriate for the Court to consider these new filings in its resolution of the preliminary injunction motion.  *See* Pls.' Memo., ECF No. 70; Defs.' Response, ECF No. 71.

## II.    LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  "The purpose

---

[9] It remains unclear to the Court whether Exhibit L includes in any of its calculations the costs associated with allowing employees age 55 and older with five years of continuous service or 15 years of aggregate service to join the DROP.

of a preliminary injunction is . . . to preserve the relative positions of the parties" pending final

resolution on the merits. *N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37–

38 (2d Cir. 2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A party seeking

a preliminary injunction must typically establish:

> a likelihood of success on the merits or sufficiently serious questions going
> to the merits to make them a fair ground for litigation and a balance of
> hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of
> irreparable injury in the absence of an injunction; (3) that the balance of
> hardships tips in the plaintiff's favor; and (4) that the public interest would
> not be disserved by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (cleaned up) (quoting

*Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)). Among these elements, "[a] showing of

irreparable harm is the single most important prerequisite for a preliminary injunction." *Faiveley

Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation and

quotation marks omitted). Additionally, "[a] plaintiff cannot rely on the 'fair-ground-for-

litigation' alternative to challenge 'governmental action taken in the public interest pursuant to a

statutory or regulatory scheme.'" *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin.

Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d

577, 580 (2d Cir. 1989)); *see also Able v. U.S.*, 44 F.3d 128, 131 (2d Cir. 1995) ("This exception

reflects the idea that governmental policies implemented through legislation or regulations

developed through presumptively reasoned democratic processes are entitled to a higher degree of

deference and should not be enjoined lightly."). And in a suit against governmental entities, the

balancing of the equities "merges" into consideration of the public interest. *SAM Party of N.Y. v.

Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021). Finally, a mandatory injunction—one that "alter[s]

the status quo by commanding some positive act"—may issue "only upon a clear showing that the

moving party is entitled to the relief requested, or where extreme or very serious damage will result

from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). "The 'clear' or 'substantial' showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Id.* (citation omitted).

## III.   DISCUSSION

Because they seek a mandatory injunction, Plaintiffs must make a "clear showing" that they are entitled to the relief requested or that "some extreme or very serious damage will result" if preliminary injunctive relief is denied. *Id.* For the reasons discussed below, Plaintiffs have not met that burden. The Court first addresses the preclusion of Exhibit L and testimony improperly offered for the first time at the preliminary injunction hearing.

### A.   Sanctions

The Court has wide discretion to impose sanctions for discovery abuses pursuant to its inherent authority to manage its own proceedings. *Reilly v. Natwest Markets Grp. Inc.,* 181 F.3d 253, 267 (2d Cir. 1999). It may disregard evidence submitted relating to preliminary injunction proceedings, particularly where the opposing party has not had a fair and adequate opportunity to respond to that evidence due to the timing of its submission. *See, e.g. Wickapogue 1 LLC v. Blue Castle (Cayman) Ltd.,* 657 F. Supp. 3d 234, 239 n.4 (E.D.N.Y. 2023).

Defendants timely produced spreadsheets reflecting CavMac's calculations prior to the evidentiary hearing, but Attorney Cieslak did not produce the document marked as Exhibit L to Plaintiffs' counsel until partway through the hearing, *after* Plaintiffs' counsel had begun his examination of Comptroller Scanlon. Attorney Cieslak had the opportunity to be heard relating to the late production. She explained that she was not made aware of this document until the night before the hearing, and did not share it with Plaintiffs' counsel because she did not believe it would be pertinent to Attorney Bucci's examination of Comptroller Scanlon. ECF No. 73 at 54–55. This

reasoning is unpersuasive. Plaintiffs' briefing in support of their request for a preliminary injunction *explicitly* took issue with the actuarial calculations in the previously-provided spreadsheet. *See* ECF No. 52 at 4–5 (pointing out that Defendants' calculations did not isolate the financial impact of a 25-years-of-service eligibility threshold and were therefore "fatally flawed"). These additional calculations are obviously relevant to the reasonableness of the DROP's eligibility requirements, and it was quite foreseeable that Plaintiffs' counsel would explore these issues with Comptroller Scanlon (which he did—*see, e.g.*, ECF No. 73 at 30). When queried, Attorney Cieslak did not provide any further explanation for her failure to timely produce this document. *Id.* at 55–56. The Court thus finds that Attorney Cieslak's decision not to produce the document upon its discovery—or, at the latest, the next morning prior to the hearing—was not merely excusable negligence. The decision to withhold a critical document from Plaintiffs until after Plaintiffs had ended their examination of Comptroller Scanlon was unreasonable, and the Court cannot conclude that it was undertaken in anything but bad faith.

If the Court were to consider Exhibit L in deciding Plaintiffs' motion for a preliminary injunction, Defendants would be unfairly advantaged, as Plaintiffs were unable to adequately prepare to question Defendants' witnesses regarding the document. Thus, the Court finds that it is appropriate to preclude admission of Exhibit L for the purposes of its preliminary injunction decision. The Court has considered potential alternative sanctions, but finds that exclusion of this document is the most appropriate response to Attorney Cieslak's conduct. For the purposes of resolving the preliminary injunction motion, the Court will not consider Exhibit L, the calculations it contains, or the portions of any witness's testimony made with aid of the document.

    B. <u>Irreparable Harm</u>

Even after disregarding Exhibit L, the Court cannot conclude that Plaintiffs have carried their burden of demonstrating an entitlement to preliminary injunctive relief, however.

First, Plaintiffs have not established irreparable harm—"the single most important prerequisite for a preliminary injunction." *Faiveley Transport Malmo AB*, 559 F.3d at 118 (internal citation and quotation marks omitted). The Second Circuit has held that allegation of a constitutional violation results in a "presumption of irreparable injury." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). But, as district courts have noted, "[t]he Second Circuit has not clearly resolved the question of whether the infringement of a constitutional right is always considered irreparable harm." *Lore v. City of Syracuse*, No. 00-CV-1833 (HGM) (DEP), 2001 WL 263051, at *7 (N.D.N.Y. Mar. 9, 2001); *Stallworth v. Joshi*, No. 17-CV-7119 (RJS), 2017 WL 8777378, at *7 (S.D.N.Y. Nov. 22, 2017) (recognizing that "an allegation of a constitutional violation is not a magic wand that can be waved to conjure up irreparable harm"); *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 55 (N.D.N.Y. 2022) ("[T]he presumption of irreparable harm is triggered only where the alleged constitutional deprivation 'is convincingly shown and that violation carries noncompensable damages.'" (quoting *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012))).

And several district courts have found that the "presumption of irreparable harm arises only *after* a plaintiff has shown a likelihood of success on the merits of the constitutional claim." *Brock v. City of New York,* No. 21-CV-11094 (AT) (SDA), 2022 WL 479256, at *4 (S.D.N.Y. Jan. 28, 2022) (emphasis added); *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 390 (E.D.N.Y. 2021) (same, with respect to constitutional violations and violations of federal statutes); *Page v. Cuomo*, 478 F. Supp. 3d 355, 364 (N.D.N.Y. 2020) (by its own terms, the *Jolly* presumption only arises after a plaintiff shows likelihood of success on the merits); *see also Green v. Caron*, No. 3:22-CV-1397 (KAD), 2023 WL 6809620, at *4 (D. Conn. Oct. 16, 2023) (finding no showing of irreparable harm where plaintiff alleged only the "mere possibility" that he may be "subjected to a deprivation

of constitutional dimension"); *Dimartile v. Cuomo*, No. 1:20-CV-859 (GTS/CFH), 2020 WL 4877239, at *8 (N.D.N.Y. Aug. 19, 2020) ("the likelihood of success on the constitutional claim is inextricably intertwined with whether irreparable harm exists"). The Court therefore declines to apply such a presumption favoring Plaintiffs where it is unlikely that they will eventually demonstrate a violation of their constitutional rights (as discussed below).

Whether a party has delayed in seeking injunctive relief may also defeat any presumption of irreparable injury. *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (holding that a party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury" (internal quotation marks omitted)); *Goldstein v. Hochul*, No. 22-CV-8300 (VSB), 2022 WL 20305832, at *2 (S.D.N.Y. Oct. 3, 2022) (assessing delay in case alleging violation of constitutional rights). Indeed, "months-long delays in seeking [injunctive relief] have repeatedly held by courts in the Second Circuit to undercut the sense of urgency." *Goldstein*, 2022 WL 20305832, at *2 (alteration in original) (internal citations and quotation marks omitted). Relevant delays include the time period following enactment of a law, before a party seeks a TRO or PI to enjoin enforcement of that law, and the time period between a plaintiff's learning of an alleged violation and seeking a TRO or PI to enjoin it. *Id.*; *see also Weight Watchers*, 423 F.3d at 144–45; *Majorica, S.A. v. R.H. Mach & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985) (per curiam) ("Lack of diligence, standing alone, may, . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm rather than occasioned prejudice.").

Here, Plaintiffs' delay in filing suit and seeking injunctive relief weighs against finding irreparable harm. The legislation authorizing the DROP was passed in June of 2023, and the

DROP regulations were adopted in April of 2024. *See* Ex. E to Scanlon Aff., ECF No. 50-1 at 83–99; Ex. G to Scanlon Aff., ECF No. 50-1 at 108–115. The Union Plaintiff participated in the creation of the DROP, and each individual plaintiff attended at least one retirement counseling session with CMERS in April or May 2024 to learn exactly how the CMERS reforms would affect their retirement benefits after they took effect in July 2025. See Scanlon Aff. ¶ 22; Piwonski Aff. ¶ 16. Even with years of advance notice about the effect that the DROP would have on their situations, Plaintiffs filed the instant suit just over a month before the DROP's effective date, nearly two years after the passage of Public Act No. 23-182 and over a year after they each learned about the DROP and its regulations. *See* ECF No. 1 (complaint filed May 25, 2025). And although they initially sought injunctive relief with their original complaint, when the Court denied that motion due to the filing of an amended complaint, they waited another two months to file an amended complaint and renew their motion for preliminary injunctive relief. *See* ECF Nos. 33 (denying original motion for preliminary injunction on June 26, 2025); 43 (renewed preliminary injunction motion filed September 2, 2025). Thus, even assuming that a presumption of irreparable harm arises from Plaintiffs' allegations of Equal Protection Clause violations, any such presumption would be undermined by Plaintiffs' own delay in filing this lawsuit and seeking the requested injunctive relief.

Without a presumption in their favor, Plaintiffs have not shown that they will face irreparable injury in the absence of a preliminary injunction. Plaintiffs assert that they face "unrecoverable monetary losses" because the DROP eligibility requirements unfairly exclude them from a benefit program, and because they cannot sue Defendants for monetary damages to remedy that harm since such a claim would be barred by the Eleventh Amendment. ECF No. 44

at 16–17.[10]  However, Plaintiffs have not set forth a theory of how such losses might occur.  The DROP functions by crediting each member's monthly retirement benefit to their account, along with interest where appropriate, while the member continues to work and receive a paycheck.  *See* Ex. F to Scanlon Aff., ECF No. 50-1 at 102–03.  The benefits are paid out in a lump sum when the member exits the DROP—meaning Plaintiffs currently are not "owed" any money by virtue of their ineligibility.  *See id.*  Plaintiffs will, eventually, have the option to participate in the DROP for up to five years and, barring any program changes, their benefits will be calculated using the exact same formula when they become DROP-eligible.  *See id.* at 102–105.  Mere, unsupported speculation that the party seeking the injunction may in some way suffer loss or damage is insufficient to establish irreparable harm.  *See Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.,* No. 86-CV-0534 (JMCL), 1986 WL 13950, at \*11 (E.D.N.Y. Sept. 9, 1986).  In sum, Plaintiffs have failed to establish that they are sufficiently likely to suffer irreparable harm to justify a preliminary injunction.

      C.  <u>Likelihood of Success on the Merits</u>

Additionally, the Court concludes that Plaintiffs have not shown a strong enough likelihood of success on the merits to warrant the mandatory preliminary injunction they seek.

Although the Court has concluded above that Plaintiffs have stated *plausible* claims, they have not, at this stage, made a clear showing that the challenged DROP eligibility requirements are unconstitutional.  The age-based classifications are presumptively rational, and Plaintiffs have not marshaled specific evidence—as opposed to allegations in the complaint that are accepted as true for purposes of a motion to dismiss—to show a likelihood that they will overcome that

---

[10] By framing their harm as unrecoverable monetary losses, Plaintiffs' argument concedes that they do, in effect, seek retrospective monetary relief through their request that they be allowed to join the DROP retroactive to their dates of retirement eligibility.  As the Court explained above, this retrospective request for injunctive relief is barred by the Eleventh Amendment.

presumption by negating every conceivable basis for the classification.  *See Bryant*, 692 F.3d at 219 (quoting *Beach Commc'ns*, 508 U.S. at 313).

For their part, in response to Plaintiffs' motion for a preliminary injunction, Defendants have argued that the DROP was passed as part of a suite of reforms aimed at lowering costs to CMERS.  *See, e.g.*, ECF No. 50 at 5, 21, 27; Scanlon Aff. ¶ 12–13; Koebel Aff. ¶ 6.  And the record before the Court—again, excluding Exhibit L—demonstrates that adjusting DROP eligibility requirements helped to create a workable cost-savings compromise that allowed the passage of bipartisan reforms.  *See* ECF No. 50-1 at 20.  Indeed, even without showing on the present motion that the financial effect of including public safety employees with twenty-five years of service at any age was not isolated in their actuarial projections, Defendants have proffered evidence that the plan ultimately adopted saved CMERS tens of millions of dollars more than a plan with more relaxed DROP eligibility for public safety employees—at least some of which was quite likely attributable to the tighter DROP eligibility restrictions.  *See* Koebel Aff. ¶¶ 8–9.[11]  The cost savings argument advanced by Defendants suffices as a presumptively rational basis for the age classification at this stage.[12]  Plaintiffs have therefore not shown that they are likely to negate "any reasonably conceivable" basis for the challenged DROP eligibility requirements.  *See Bryant*, 692 F.3d at 219; *see also Able*, 44 F.3d at 131 (recognizing that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly").

---

[11] The Court's citation to the Koebel affidavit refers to the original Koebel affidavit at ECF No. 50-2, not the revised Koebel Affidavit at ECF No. 72.

[12] The Court notes that none of Defendants' affidavits explain *why* exclusion of Plaintiffs and those similarly-situated from the DROP leads to less savings for CMERS.  While the calculations are facially sufficient to find that Plaintiffs have not demonstrated a clear likelihood of success on their claims for purposes of the present motion, more explanation may be required at a later stage in the litigation.

D.  <u>Balance of Hardships and Public Interest</u>

 Although the Court's discussion above is dispositive of Plaintiff's motion, the Court also addresses the balance of the equities and public interest factors together, in the interest of completeness.  *See CollaGenex Pharms., Inc. v. IVAX Corp*, 375 F. Supp. 2d 120, 140 (E.D.N.Y. 2005).  The public interest and balance of equities do not favor Plaintiffs.

To start, the Court notes that Plaintiffs have not included *any* discussion of the public interest or balance of equities factors in their moving papers or in their reply brief.  *See* ECF Nos. 44, 52.  The Court will not speculate as to what Plaintiffs' arguments on these factors would have been, since they are represented by counsel.

The balance of hardships does not tip in Plaintiffs' favor, for the same reasons the Court has concluded that Plaintiffs have not shown irreparable harm; their harm is not well-articulated, given that they will be eligible for the DROP in the future and the calculations of their DROP benefits are not expected to change.  And to grant a preliminary injunction at this stage would create uncertainty within the DROP until Plaintiffs' entitlement to a permanent injunction is resolved.  For instance, if the Court were to order preliminarily that Plaintiffs and others similarly situated should be allowed to join the DROP upon achieving 25 years of service—and then later conclude on a fuller record that a permanent injunction is unwarranted because Defendants have demonstrated a rational basis for the age classification—there may be significant confusion about how to calculate any retirement or DROP benefits for those individuals who were allowed to join in the meantime.  A preliminary injunction that requires CMERS to admit Plaintiffs into the DROP now may also affect other similarly-situated CMERS members' decisions about when to retire, creating uncertainty and instability within the CMERS system and for its members.  Finally, Defendants proffer that, if a preliminary injunction were granted, they may simply discontinue the DROP, which would deny future retirees the possibility of the benefits of it.  ECF No. 50 at 28.

Thus, while there is a public interest in avoiding violations of constitutional rights, *see N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), the more compelling public interest in a stable municipal employees retirement system counsels in favor of judicial restraint—particularly where Plaintiffs have not met their burden of showing irreparable harm or clear likelihood of success on the merits.

\* \* \*

## CONCLUSION

For the reasons described herein, Defendant's motion to dismiss, ECF No. 45, is DENIED. Plaintiffs' motion for a preliminary injunction, ECF No. 43, is likewise DENIED.  The deadlines set forth in the Court's scheduling order at ECF No. 42 remain in place.

**SO ORDERED** at Hartford, Connecticut, this 4th day of February, 2026.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE